**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL ACTION FILE** |
| | ) | |
| **STEVEN EDRICK HAYES,** | ) | **NO. 1:15-CR-125-LMM-AJB** |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

Before the Court is Defendant Steven Edrick Hayes' motion to suppress evidence.  [Doc. 13].  For the following reasons, the undersigned **RECOMMENDS** that the motion be **GRANTED**.

*I.      Introduction*

Hayes was charged by an indictment with possessing a firearm that affected commerce, in violation of 18 U.S.C. §§ 922(g) and 924(e).  [Doc. 1].  After arraignment he moved to suppress the firearm as having been seized in violation of his Fourth Amendment rights.  [Doc. 13].  The Court held two evidentiary hearings, [Doc. 34 (hereinafter "1T__"); Doc. 36 (hereinafter "2T__"), after which the parties filed briefs.  [Doc. 38 (Govt.); Doc. 42 (Hayes)].  The matter is now ripe for a recommended resolution.

## II.    Facts

On October 23, 2014, at about 1:23 a.m., College Park, Ga., Police Officer Joseph Franczek was performing his approved extra job providing security for the Travelodge Motel at 2471 Old National Highway.  1T5-7, 9.[1,2]  He was dressed in his police uniform but drove his personal vehicle.  1T8.  He described the Travelodge as being in a high crime and prostitution area, and the motel cooperates with the police in allowing them to conduct prostitution stings on the premises.  Franczek stated that the motel hired the police to protect its employees and guests, and on a weekly and sometimes daily basis, crimes were reported at the motel or the motel asked for the police to assist.  1T8-9, 25.

The motel was comprised of two buildings with all exterior entrance rooms and a parking lot, with the building closest to Old National Highway running north to south

---

[1]    At the time of the incident involved in this case, Franczek had been a police officer in Ohio and Georgia for approximately six years.  He described his training in narcotics cases as consisting of completing two police academies and a few drug-related courses where he learned to identify illegal drugs.  He had made several arrests for illegal drugs.  1T5-6.

[2]    Franczek had been performing this extra job since 2011.  1T23.  In performing his job, he regularly walked on foot through the complex, checking for subjects sitting in vehicles and open hotel or vehicle doors, and making sure that people walking around the property were supposed to be there.  1T29.

2

with the rooms facing east and west, and the rear building running east to west, with the rooms facing north and south.  1T49.  Franczek was walking around the parking lot making sure all of the motel doors were secure.  The parking lot was not very well lit and was not crowded.  1T9-10.[3]

While on his rounds, Franczek saw an automobile parked in a parking space on the east side of the first building, facing the neighboring motel; and at the time he decided to investigate, the vehicle had been there for about fifteen minutes.  1T10-11, 49-50.  Franczek decided to approach it to see if the vehicle's occupant(s) needed assistance such as directions or were getting a motel room.  1T10-11.  It was common for people to seek directions that close to the airport.  1T11, 36.

Prior to observing the vehicle, there had been no complaints or calls about the vehicle.  1T30.  Franczek did not recall if the vehicle's lights were illuminated or if there were any lights on inside the vehicle.  T50.  As he approached the vehicle, Franczek saw that the engine was on and one person was in the vehicle.  1T11, 30, 32; *but see* 1T34 (Franczek stating that he could not recall whether the engine was on or off).

---

[3]     The video security system at the Travelodge did not capture the encounter described in the text *infra* because the cameras were directed to the sidewalks closer to the buildings.  1T25.

He radioed that he was approaching a suspicious vehicle, but he was not sure that he called in the tag number.  1T15; *compare* 1T33 *with* 1T51-52.  Franczek does not recall if the driver's side window was up or down when he first approached the vehicle. He approached the vehicle from the driver's side rear.  1T11.  The driver, soon identified as Hayes, was looking down with his hands in his lap until Franczek approached and stated "good evening"; when Hayes looked up, Franczek described his eyes getting "real big" and that he looked surprised.  1T34, 42, 51.  Franczek stood about a foot away from the vehicle, right beside the B-pillar (the door post between the front and back seat windows).  1T35, 51; *see also* IT53 (describing his position). Franczek stated that he was 6'1" or 6'2" tall.  1T52.

Franczek asked Hayes whether he was alright or needing anything, and whether he had a room at the motel.  At this point, the driver's window was down, although Franczek could not recall whether it was all the down or just partially down.  1T11-12, 32, 35-36.  Hayes responded that he did not have a room and he was getting ready to leave.  1T11-12, 36.

As Franczek spoke to Hayes, for his safety he looked around the interior of the vehicle for weapons or anything else he could see, although he had no reason to believe that Hayes was armed.  1T12, 14.  He probably used his flashlight to illuminate the

4

vehicle's interior.  1T12-13, 48.  He did not lean into the vehicle.  1T13.  He testified

that while he was standing directly next to the driver's side door, he saw a small clear

plastic baggy appearing to contain a white powdery substance located in what Franczek

described as the rectangle one puts their hand in on the driver's side door armrest to

close the door.  1T13, 45, 54.[4]  He stated that the armrest was level with the ground, and

not at an angle, and protruded from the driver's door about two to three inches.

1T41, 54.  He believed the white substance to be cocaine, since it was not uncommon

for him to come upon people in the parking lot doing drugs.  1T14.  He acknowledged

that the baggy was not much larger than the square drawn on Def. Ex. 1, which

measures 1" x 1¼" or 1⅛".  1T37-38.  Franczek did not recall whether it was a small

ziplock baggy or tied off in a knot.  1T14.

      Franczek knew there were other police units in the area that had just completed

a call so he radioed them to respond to his location.  1T16, 43, 65.  He did not tell them

that he had located suspected cocaine.  1T44.  He also asked Hayes for identification,

advised his radio that he had done so and at that point, the backup unites arrived.  1T17.

Dispatch checked Hayes' identification for active warrants, and there was none,

---

[4]     Franczek clarified that the opening in which he saw the baggy was not the actual door handle, but what one would grab on the armrest to close the car door.  1T13.

AO 72A
(Rev.8/8
2)

although the record is silent as to when in the sequence of events this fact was conveyed to Franczek.  1T17.

Franczek opened Hayes' door and asked him to exit the vehicle, and Hayes complied.  1T18.  Sgt. Boyd Burns and two other officers arrived just at the time Hayes exited his vehicle, approximately twenty to thirty seconds after Franczek's request for backup.  1T51, 65.  When Hayes stepped out of the vehicle, Franczek asked him to turn around and face away from him.  Hayes began to resist verbally, saying something to the effect that he did not do anything, although Franczek could not remember exactly what Hayes stated.  IT18, 19.  When Franczek grabbed Hayes' hand to place it behind his back, Hayes began to physically resist arrest by pushing away from the vehicle and trying to get away from the officers.  1T18, 59.  As Franczek, Burns, and the other officers began taking Hayes down to the ground, Franczek and Burns (who was holding Hayes' right wrist) believed that Hayes was trying to reach underneath to his waist as Franczek got one handcuff on him.  1T19, 61.  (Burns initially thought he was trying to get to drugs to destroy.  1T61.).  As Burns tried to get Hayes' arm out from underneath him, Franczek and Burns heard a metal object strike the ground, and one of the other officers said "gun."  1T19-20, 61-62, 63.  The officers were able to complete handcuffing Hayes, and they picked him up off of the ground.  1T20.

6

Franczek called for a transport unit and searched Hayes for weapons and contraband. 1T22. Burns located a .22 caliber handgun underneath the vehicle parked next to Hayes' vehicle. 1T62, 63-63. Cocaine was located in Hayes' pocket. 1T46. The vehicle was searched and the clear plastic baggy was seized. IT22, 45. No photographs were taken that day either of the cocaine in the armrest or the vehicle. 1T46. Further, there was no evidence admitted as to the quantity of cocaine in the baggy or seized from Hayes' person. 2T112.

Prior to the second evidentiary hearing, an investigator for Hayes' counsel went to inspect Hayes' vehicle and take photographs on two separate occasions. On the first date, he was met there by the ATF case agent and another ATF agent.[5] On a separate day, the investigator inspected the vehicle by himself and measured one foot from the door post of the vehicle and took a photograph at the approximate height of Franczek's eye level by holding the camera phone above his head.  2T81-86; Def. Exs. 2-4.[6]

-------------------

[5]    The photograph that the investigator took the first day from the approximate vantage point of the officer had too much glare because the window was up.  2T91.

[6]    The investigator also testified that he could not see the armrest compartment from his vantage point.  2T83.  The Court does not consider this testimony because (1) the recreated event occurred at 11:00 am (2T82) on a sunny day, which lighting conditions differed from those at the time of the incident at issue; and (2) the investigator is shorter than Officer Franczek (5'8" versus 6'1" or 6'2") and thus

7

At the request of the ATF case agent, on a separate occasion from the times the defense investigator examined the vehicle, Franczek also went and looked at the vehicle, and photographs approximating where he was on the night of the encounter with Hayes were also taken.  Govt. Exs. 1-3; 2T97-100.  He claimed that Govt. Ex. 3 shows loose change in the armrest indenture, although the Court did not see either the armrest or the change in the photograph due to the glare of the sun and the refection of the concrete in the window.  2T99.  In addition, in describing how he looked into the vehicle on the night of the encounter with Hayes, Franczek testified that during the encounter, "I'm facing the vehicle is what I'm trying to explain.  I'm not looking at it down at an angle.  I don't know how to explain it.  2T110.  However, Govt. Exs. 1 and 2 show Franczek looking down.[7]

---

would have had a completely different vantage point than the officer.   2T84.

[7]   The Court also does not accept the Government's after-the-fact evidence as to what Franczek could see.  First, the physical conditions on the day Franczek went out to look in the vehicle again were different than the date of Hayes' arrest, because his second viewing occurred in broad daylight while the relevant events occurred at night in a dimly lit parking lot presumably with the use of a flashlight.  Second, Franczek testified that on the night of the encounter he was one foot away from the vehicle but the photographs submitted show him much closer, which would have given him a better angle to see the armrest indentation.  Third, by the time of the experiment, Franczek was aware that the focus was on the armrest, and thus his attention would have been drawn to it.

### III.   *Arguments of the Parties*

The Government argues that Franczek's encounter with Hayes was lawful. It first argues that the Fourth Amendment was not implicated by Franczek's approach of Hayes' parked car. [Doc. 38 at 4-6]. It then argues that Franczek had reasonable suspicion to detain Hayes for sitting in a parked vehicle for an extended time at 1:23 a.m. in a parking lot of a motel known for drug sales and prostitution, followed by Hayes' responses to Franczek's queries that he was alright and just leaving. [*Id.* at 7]. The Government speculates that "Defendant could have been waiting to engage in drug distribution, prostitution, or some kind of theft or assault sitting in a parked car in a parking lot of a motel where he was not a guest at 1:23 a.m." [*Id.* at 7-8]. It also argues that Franczek was hired by the motel to look for and prevent this very behavior. [*Id.* at 8 n.2].

It alternatively argues that reasonable suspicion existed when Franczek saw the clear plastic baggy with a white powdery substance. [*Id.* at 8]. It contends that Franczek's observations were just as he recalled and reported them, and that he was a credible witness. [*Id.* at 8 n.2]. It then argues that once Franczek had reasonable suspicion to investigate the circumstances of Hayes' presence and the suspected cocaine, Hayes' obstruction of the officers' attempts to secure him gave rise to probable

9

cause to arrest him, and the firearm (and the cocaine) were properly seized. [*Id.* at 9-12].

Hayes responds that there was no reasonable suspicion to perform a *Terry* stop. He argues that prior to the claimed observation of the baggy, Franczek lacked reasonable suspicion to detain him because Hayes was not doing anything improper except being a black male sitting in a vehicle, [Doc. 42 at 4-13, 17-20], and that Franczek's testimony about seeing the baggy of cocaine should not be believed. [*Id.* at 14-17].   Therefore, he argues, because there was no reasonable suspicion to remove him from the vehicle, Hayes had the right to resist an unlawful detention or arrest.  [*Id.* at 20-22].  He contends that, as a result, any evidence obtained as a result of the unlawful arrest, including the firearm, is subject to suppression.  [*Id.* at 22-23].

The Government did not file a reply brief.

## IV.    *Applicable Law*

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. CONST. AMEND. IV. "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause."  *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005).  Evidence

AO 72A
(Rev.8/8
2)

obtained in violation of the Fourth Amendment must be suppressed. *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009)[8]; *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search.").[9] Thus, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire, supra*.

---

[8]    The Government also bears the burden  to demonstrate the legality of a warrantless arrest. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Tobin*, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991) (en banc).

[9]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

A so-called "*Terry* stop" is one such narrow exception.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000); *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000).  Under *Terry*, police officers may make an investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity.  *Terry*, 392 U.S. at 21. Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient.  *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996).  "Reasonable suspicion consists of 'a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.' " *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (quoting *United States v. Knights*, 534 U.S. 112, 121 (2001)).  "The reasonable suspicion standard requires less than probable cause and 'considerably less' than a preponderance of the evidence." *Navarette v. California*, --- U.S. ----, ----, 134 S. Ct. 1683, 1687 (2014) (quotation omitted); *United States v. Mendoza*, No. 15-13953, 2016 WL 4191130, at *2

(11th Cir. Aug. 9, 2016). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Wardlow,* 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27). Thus, the "detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). That is, the officers or agents involved in the challenged law enforcement activity must "articulate some minimal, objective justification" for an investigatory stop. *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989)); *see also Yuknavich*, 419 F.3d at 1311 ("It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required.") (citing *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003)). "The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (internal citations and quotations omitted). To determine whether reasonable suspicion exists, courts evaluate a totality of the circumstances from the viewpoint of a reasonably well-trained officer, *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000),

13

taking into account the fact that an experienced officer can infer criminal activity from conduct that may seem innocuous to lay observers. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). Moreover, the "officer's motive . . . does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment[.]' " *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)). And, of course, the validity of a search is not dependent upon what it reveals. *Bumper v. North Carolina*, 391 U.S. 543, 548 n.10 (1968) (search not justified by what it turns up); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("We have had frequent occasion to point out that a search is not to be made legal by what it turns up. . . .  In law it is good or bad when it starts and does not change character from its success.") (footnote omitted).

## V.      Discussion

First, the Court rejects the Government's argument that Hayes' presence in the Travelodge parking lot at 1:23 a.m., even given that the area was known for crime and prostitution, qualifies as reasonable suspicion. Something more than a defendant's suspicious presence in an area has always been required by the Supreme Court and the Eleventh Circuit for a lawful *Terry* stop. *See Wardlow*, 528 U.S. at 124 (holding that a person's "presence in an area of expected criminal activity, standing alone, is not

14

enough to support a reasonable, particularized suspicion that the person is committing a crime[,]" but recognizing that the police "are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").  While there is no exhaustive list of specific factors required for "reasonable suspicion" to justify a *Terry* stop, factors that the courts have considered contextually relevant in determining the validity of a *Terry* stop include: (1) a report of a recent and serious crime, *United States v. Raino*, 980 F.2d 1148, 1150 (8th Cir. 1992); (2) furtive conduct suggesting consciousness of guilt, *Wardlow*, 528 U.S. at 124 (*e.g.*, headlong flight); (3) furtive gestures, *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984); (4) nervous apprehension at the approach of police, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); (5) suspicious presence in a "high crime" area, *United States v. Atlas*, 94 F.3d 447, 450 (8th Cir. 1996); (6) proximity to the scene of a reported crime, *United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983); (7) an officer's experience and specialized knowledge, *Arvizu*, 534 U.S. at 276; (8) an officer's knowledge of a suspect's reputation, *United States v. Kimball*, 25 F.3d 1, 7 (1st Cir. 1994); (9) information from a reliable informant, *Adams v. Williams*, 407 U.S. 143, 145-46 (1972); (10) resemblance to a witness's or victim's description, *United States v. Martin*, 28 F.3d 742, 744-45 (8th Cir. 1994); and

15

(11) evasive answers to police questions, *Devenpeck v. Alford*, 543 U.S. 146, 155-56 (2004).   *See United States v. Marcelino*, 736 F. Supp. 2d 1343, 1348-49 (N.D. Ga. 2010); *United States v. Camacho*, 608 F. Supp. 2d 178, 182 (D. Mass. 2009).

Thus, for example, the Supreme Court has "recognized that nervous, evasive behavior is another pertinent factor in determining reasonable suspicion," with unprovoked headlong flight being the "consummate act of evasion." *Wardlow*, 528 U.S. at 124.  Likewise, the Eleventh Circuit has found that a defendant's evasive behavior, including his flight from law enforcement, is an additional factor that gives rise to reasonable suspicion.  *See United States v. Jordan*, 635 F.3d 1181, 1187 (11th Cir. 2011) (explaining that defendant's presence in an area known for crime, his belligerent attitude, bulge in his pocket and his flight from the law enforcement officers together supported the conclusion that the officers had reasonable suspicion to conduct a *Terry* stop); *United States v. Franklin*, 323 F.3d 1298, 1301-03 (11th Cir. 2003) (defendant's flight was particularly suspicious because of its nature and duration); *United States v. Hunter*, 291 F.3d 1302, 1306-07 (11th Cir. 2002) (finding reasonable suspicion for *Terry* stop where individual was in a high-crime area, observing an illegal gambling dice game, had a noticeable bulge in his pocket, *and* walked quickly away when officers approached the area); *United States v. Briggman*, 931 F.2d 705, 709

16

(11th Cir. 1991) (affirming district court's finding of reasonable suspicion based on observations that defendant had parked in parking lot of closed business establishments located in high-crime area at 4:00 a.m. and had attempted to evade police); *see also United States v. Mosby*, 630 Fed. Appx. 961, 964 (11th Cir. Nov. 3, 2015) (police had reasonable suspicion to seize defendant where he was seen in high-crime area, he responded to officers' questions in a way that indicated he was lying or at least being evasive, and "most obviously" he attempted to flee from officers); *United States v. Burrows*, 566 Fed. Appx. 889, 892 (11th Cir. May 21, 2014) (reasonable suspicion existed where defendant was seen, early in the morning in a high-crime area, park away from all other cars in a paid parking lot, stay in his car, act in a way that was consistent with rolling a marijuana cigarette, and deliberately depart upon seeing officers); *United States v. Reed*, 402 Fed. Appx. 413, 416 (11th Cir. Oct. 22, 2010) (reasonable suspicion found where defendant in a known high-crime area, defendant engaged in "furtive 'fight or flight' eye movement," and hand and body movements and positioning that indicated to seventeen-year police veteran that defendant was attempting to conceal or discard something as officer approached).  The present case contains none of the additional conduct or actions by Hayes to support a finding of reasonable suspicion.

17

Other case law supports the Court's conclusion that Franczek did not have reasonable suspicion to detain Hayes as a result of his presence in the motel parking lot. Thus, in *United States v. Carr*, 296 Fed. Appx. 912 (11th Cir. Oct. 22, 2008), reasonable suspicion was found to exist where the officers observed Carr and his passenger apparently loitering at 7:45 p.m. in the parking lot of a strip mall known for drug trafficking.  Carr's vehicle was parked in a manner that obscured its license plate and the passenger in Carr's vehicle had been involved in previous incidents of loitering and drug activity.  Both Carr and his passenger appeared surprised to see police officers in the area and prepared immediately to drive away. *Id.* at 916.  In the present case, there was no evidence that Hayes attempted to conceal his presence or his identifying information, nor did he attempt to flee upon being confronted by Franczek.

Second, the Court rejects Hayes' contention that he was seized prior to Franczek's opening of the car door and directing Hayes to exit the vehicle.  There are three categories of police-citizen encounters contemplated within the Fourth Amendment:  (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests. *United States v. Cusick*, 559 Fed. Appx. 790, 791 (11th Cir. Feb. 24, 2014) (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)).   Interactions falling within the first

18

category—consensual encounters—are not subject to Fourth Amendment scrutiny. *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).  The Supreme Court has stated that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen" and that "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Drayton*, 536 U.S. 194, 200-01  (2002); *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (stating that "[o]fficers are free, without any level of suspicion, to approach citizens on the street or in a public place and ask them questions [and] request proof of identification. . . ."). "This test 'is objective and presupposes an innocent person.' " *United States v. Ramirez*, 476 F.3d 1231, 1238 (11th Cir.2007) (quoting *Drayton*, 536 U.S. at 201-02 (citation and internal quotation omitted)) (emphasis in original).  Thus, the simple act of police questioning does not constitute a seizure.  *See Florida v. Bostick*, 501 U.S. 429, 434,  (1991); *Perez*, 443 F.3d at 778.  As a result, Franczek was entitled to approach Hayes' vehicle, illuminate the interior of his vehicle, and inquire of his presence without any suspicion whatsoever.  *Rance v. City of Palm Springs*, 645 Fed. Appx. 933, 943 (11th Cir. Mar. 14, 2016) (citing *Purcell*, 236 F.3d at 1277-78).  Moreover, " 'an

AO 72A
(Rev.8/8
2)

officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure.' " *United States v. Moulton*, Criminal Case No. 1:10-CR-00120-MHS-RGV, 2010 WL 6084115, at *5 (N.D. Ga.   Nov. 22, 2010), *adopted by* 2011 WL 902639, at *1 (N.D. Ga. Mar. 14, 2011) (alteration in original); *see also United States v. Baker*, 290 F.3d 1276, 1279 (11th Cir. 2002) (defendant not seized when officers approached vehicle momentarily stopped in vehicular traffic); *United States v. Graham*, 323 Fed. Appx. 793, 798 (11th Cir. Apr. 20, 2009) (holding that "the mere act of approaching Graham in his parked car was permissible, regardless of whether the officers had reasonable suspicion of criminal activity").  Therefore, Hayes was not seized by Franczek prior to Franczek opening Hayes' car door, even if there was no reasonable suspicion up to that point.  *INS v. Delgado*, 466 U.S. 210, 215 (1984) (A seizure begins when "all the circumstances surrounding the incident" are such that "a reasonable person would have believed that he was not free to leave.") (citation omitted); *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) ("Certainly, when Fowler ordered Hill to exit the car and gestured for him to turn around and put his hands on the car so that he could be frisked, Hill was not free to leave at that moment, and thus, Hill was seized then.").

AO 72A
(Rev.8/8
2)

Thus, as a result, as the Court stated at the evidentiary hearings, the legitimacy of the police action in this case turns on whether the Government proved that Franczek saw the baggy of cocaine on the armrest prior to opening the door and directing that Hayes get out of the vehicle.  *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) ("The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent."); *see also United States v. Edwards*, 307 Fed. Appx. 340, 344 (11th Cir. Jan. 13, 2009) (finding that officers had probable cause to arrest suspect based on officer's viewing of what appeared to be a bag of marijuana in plain view between the front seats of the car).  The Court concludes it has not satisfied this burden.

First, the Court puts very little stock in the post-event attempts by both parties to recreate the October 23, 2014 encounter.  For the reasons stated in the footnotes, the Court discounts the accuracy, dependability, and usefulness of these after-the-event experiments.  The Court recognizes that it suggested an out-of-court experiment as a way to fill in gaps in the record, *see*  1T72-73, but the experiments attempted by the

21

parties, particularly since they were not undertaken at night with the driver's window down, are of limited usefulness.

In addition, the Court is concerned about the uncertainty of Franczek's testimony about key details of the case.[10]   Was Hayes' vehicle running or not running, *compare* 1T11 (car was running) *with* 1T30 ("I believe it was running") and 1T34 ("I believe so.  Again, this was a while ago.  I'm not a hundred percent sure. . . . No.  At this moment, no, I don't know if the car was running."); were any lights on either inside or outside the vehicle, 1T50; was the window up or down, *see* 1T11 ("I'm not a hundred percent sure if it was up or down.  I'm not sure if I, you know, tapped on the window to have it rolled down or -- I don't recall."), 1T35 (same); did he call in the tag or not as he approached the vehicle, *compare* 1T15 ("I believe I provided them with the tag that was on the vehicle prior to my contact, not a hundred percent sure.") *with* 1T51 ("I'm not quite sure if I ran the tag on my approach the vehicle or if it was after. Sometimes I would say that I do it before, and, you know, sometimes I just make contact."); was he looking down into the vehicle or not, *compare* 2T110 (in describing

---

[10]   The Court also observes that, during the first evidentiary hearing Franczek sat up in the witness chair and testified directly into the microphone while on direct examination, but on cross-examination, he slouched back in the chair and was less forthcoming.  *See, e.g.*, 1T42.

how he looked into the vehicle on the night of the encounter with Hayes, Franczek testified that during the encounter, "I'm facing the vehicle is what I'm trying to explain. I'm not looking at it down at an angle. I don't know how to explain it.") *with* Govt. Exs. 1 and 2 (showing Franczek looking down); and most importantly, was the baggy a ziplock bag or a bag with the corner tied off, 1T14? Further, the Government was unable to introduce evidence of the amount of cocaine contained in the baggy, which made it more difficult for the Court to consider the likelihood that Franczek saw white powder in the baggy when he stated he did.

The Court recognizes that Franczek's uncertainty could be caused in part because of the delay in this case, since the evidentiary hearing was postponed on two occasions, first because Hayes was trying got get new counsel and then because he was arrested on other charges. [Doc. 22, 26]. However, these were critical details that would at a minimum strengthen the Government's presentation. The Court further recognizes that cocaine was in fact discovered that night, not only because there was testimony that cocaine was seized from the vehicle and Hayes' person but because Hayes ultimately was indicted *inter alia* for possession of cocaine in Fulton County Superior Court,[11] but

_____

[11] *See* Fulton County Superior Court Register of Actions, Case No. 14SC130540, http://justice.fultoncountyga.gov/PASupCrtCM/CaseDetail.aspx?CaseID=6842576

these facts do not establish what Franczek saw before he opened Hayes' car door, and the Fulton County docket does not indicate whether the cocaine that Hayes was charged with was the cocaine in the armrest, found in his pocket, or both.

Nonetheless, the Court is left with the conclusion that the Government did not prove that Franczek observed the baggy of cocaine before he opened Hayes's car door, and thus there was no reasonable suspicion justifying Hayes' seizure.  That Hayes subsequently obstructed the officers trying to handcuff him is of no moment, because he could lawfully resist an unlawful arrest, *Merenda v. Tabor*, 506 Fed. Appx. 862, 867 (11th Cir. Feb. 1, 2013) (citations to Georgia cases omitted); *Gainor v. Douglas County, Ga.*, 59 F. Supp. 2d 1259, 1281 n.23 (N.D. Ga. 1998) (Carnes, J.) (citing cases), and the detention was not warranted because it was not supported by reasonable suspicion. Moreover, given binding precedent, evidence obtained as a result of a Fourth Amendment violation may be suppressed as fruit from the poisonous tree, *see Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), even if that evidence, like the firearm in this case, is subsequently abandoned so long as an illegal search taints the abandonment, *United States v. Beck*, 602 F.2d 726, 729-30 (5th Cir. 1979) (suppressing evidence where abandonment was caused by illegal stop); *see also United States v.*

———————————————

&ShowAllCharges=1 (last visited 10/04/16).

24

*Caballero–Chavez*, 260 F.3d 863, 867 (8th Cir. 2001); *United States v. Foster*, 566 F. Supp. 1403, 1412 (D.D.C.1983).  Therefore, even though the Government did not argue abandonment, *Beck* mandates that the firearm discovered as a result of the illegal arrest be suppressed.

**VI.     Conclusion**

For all of the above reasons, the undersigned **RECOMMENDS** that Hayes' motion to suppress evidence, [Doc. 13], be **GRANTED**.  The undersigned has now disposed of all matters referred by the District Judge, and has not been advised of any problems related to discovery or impediments to scheduling a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 6th day of October, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

25